## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Kevin Pared, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Homeland Security Investigations ("HSI"), a position I have held since 2023. I am currently assigned to the Homeland Security Task Force ("HSTF") and Border Enforcement Security Task Force ("BEST") in San Juan, Puerto Rico. Prior to my appointment as a Homeland Security Investigations Special Agent, I worked as a Border Patrol Agent with the United States Border Patrol from 2021 to 2023.

2. As a Homeland Security Investigations Special Agent, I have received formal and on-the-job training. I have attended the Criminal Investigator Training Program ("CITP") and the HSI Special Agent Training ("HSISAT") at the Federal Law Enforcement Training Centers in Glynco, Georgia. I was trained to conduct criminal investigations related to narcotics, currency, firearms, contraband smuggling, interdiction and distribution activities, among others. In this position, I am authorized to investigate violations of laws of the United States and to execute and serve any order, subpoena, summons, warrant, or other process issued under the authority of the United States. I am familiar with the statutes of the United States Code, and I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. As a federal law enforcement officer, I have participated in investigations, surveillance, interviews, interrogations, arrests, searches, seizures, administration of oaths, and in the analysis of evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States. I am also a "customs officer" and am familiar with Title 19 of the United States Code.

3. As a Special Agent, my duties and responsibilities include, but are not limited to, conducting investigations related to potential violations of 18 U.S.C. § 2199, and 21 U.S.C. §§ 841 and 846, and other offenses against the United States.

4. During my law enforcement career, I have become familiar with the trafficking and smuggling of illicit controlled substances and its proceeds, as well as drug trafficking organizations and transnational criminal organizations operating in the United States and overseas. As part of my duties, I have arrested persons engaged in unlawful activities, executed search warrants of homes and properties of persons engaged in drug trafficking, money laundering, and smuggling, and participated in seizures of property and currency, which constituted the proceeds of illegal drug trafficking activity. Moreover, I have interviewed persons involved in drug trafficking and money laundering and debriefed confidential informants and sources of information regarding the habits and practices of people engaged in drug trafficking and the smuggling of goods into and from the United States, as well as the methods utilized to launder the proceeds of illegal activities.

5. Through my training and experience, I have become familiar with the modus operandi of drug traffickers, including but not limited to the distribution, storage and transportation of controlled substances, and the collection of the proceeds of drug trafficking. I am also familiar with methods employed by transnational criminal organizations to thwart detection by law enforcement, including the use of vague and coded language, cellular telephone technology, counter surveillance, use of false or fictitious identities, encrypted mobile applications, encoded communications, and shipments contrary to law, including but not limited to unmanifested merchandise and controlled substances concealed within merchandise.

6. I have received instruction and training and have participated in investigations involving drug trafficking organizations and the laundering of drug proceeds. I have used a variety

of investigative techniques, including interviews of confidential informants and witnesses; surveillance, controlled purchases of evidence (controlled substances); consensual monitoring and recording of telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; and search and arrest warrants that have led to seizures of narcotics, firearms and contraband.

7.    This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter. I make this affidavit based on my own personal knowledge and on oral and written reports by other federal, state, and/or local law enforcement agents and officers that investigated this matter. This affidavit does not contain all the information derived from this investigation only that which is sufficient to demonstrate probable cause to believe that a crime has been committed.

8.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2199, and 21 U.S.C. §§ 841 and 846 have been committed by **Vladimir DE OLEO NUÑEZ**.

## PROBABLE CAUSE

1.    On January 28, 2026, at approximately 4:48 AM, U.S. Coast Guard ("USCG") Sector San Juan received a report via radio from the tugboat **SIGNET THUNDER**, which was towing barge **SAN JUAN-JAX BRIDGE**. The tugboat reported that while enroute to the Trailer Bridge Terminal in San Juan, Puerto Rico, a crewmember boarded the barge and discovered a stowaway[1] on board. Before USCG assets arrived on scene, the tugboat further reported observing an individual jump to the water along with what appeared to be multiple bales.

---

[1] The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft.

3

2.  Upon arrival on scene, USCG personnel recovered one individual from the water, later identified as **Vladimir DE OLEO NUÑEZ**, along with 10 bales of suspected contraband, later confirmed through field testing to be cocaine.

3.  USCG transported **Vladimir DE OLEO NUÑEZ** and the 10 bales to the HSI San Juan building in San Juan, Puerto Rico, where USCG personnel conducted two field tests on the contents of the bales. Both tests yielded positive results for the characteristics of cocaine.

4.  On the same day, at approximately 8:58 AM, at the HSI San Juan office, HSTF personnel advised **Vladimir DE OLEO NUÑEZ** of his Miranda rights in Spanish. He waived his rights and agreed to speak with law enforcement officers, answering questions about the events. During the interview, law enforcement learned the following:

    a. **Vladimir DE OLEO NUÑEZ** paid approximately seven thousand five hundred U.S. dollars (USD $7,500) to an individual to be smuggled from the Dominican Republic to the United States, specifically to Puerto Rico. The smuggling venture involved a vessel approaching a barge while it was sailing near the Dominican Republic so that **Vladimir DE OLEO NUÑEZ** could clandestinely board the barge. Upon the barge's arrival in the vicinity of San Juan, Puerto Rico, he was to jump off the barge and be picked up by another vessel.

    b. Upon boarding the barge, **Vladimir DE OLEO NUÑEZ** observed multiple bales onboard and recognized the bales as drugs.

    c. During the voyage, **Vladimir OLEO NUÑEZ** communicated with the intended pickup vessel via radio at predetermined times in order to coordinate the location and timing of his jump from the barge.

d. After crewmembers from the tugboat boarded the barge, **Vladimir OLEO NUÑEZ** no longer received responses from the pickup vessel via radio. He then jumped off the barge, remained in the water for approximately one hour, and used the ten (10) bales to stay afloat, although he claimed not to know how those bales entered the water.

5. HSTF personnel interviewed the tugboat's crew members and learned the following:

   a. CREW MEMBER 1 observed **Vladimir DE OLEO NUÑEZ** standing near the bales, **Vladimir DE OLEO NUÑEZ** asked CREW MEMBER 1 to help him. CREW MEMBER 1 then observed **Vladimir DE OLEO NUÑEZ** using a phone and subsequently observed him throw both the bales and the phone into the water before jumping off the barge. CREW MEMBER 1 recognized the phone as a satellite phone because he had seen a similar phone on the same barge approximately two weeks earlier.

   b. CREW MEMBER 2 observed **Vladimir DE OLEO NUÑEZ** in the middle of the barge. The crew members asked **Vladimir DE OLEO NUÑEZ** in Spanish, "What are you doing here?" **Vladimir DE OLEO NUÑEZ** mumbled a response, but CREW MEMBER 2 could not understand what he said.

6. The ten (10) bales were transported to the U.S. Customs and Border Protection Seaport Examination Site for further processing, where they were weighed and found to have an approximate total weight of 358 kilograms.

[INTENTIONALLY LEFT BLANK]





[INTENTIONALLY LEFT BLANK]

6

## CONCLUSION

7.      Based on the forgoing, and based upon my training, experience, and participation in this and other investigations, I believe that sufficient probable cause exists to demonstrate that **Vladimir DE OLEO NUÑEZ** violated: (1) 18 U.S.C. § 2199 - Stowaways on vessels or aircraft, (2) 21 U.S.C. §§ 841 and 846 - conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, and (3) 21 U.S.C. §§ 841 and 846 - attempted possession with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine.

[INTENTIONALLY LEFT BLANK]

Respectfully submitted,

KEVIN A PARED CUEVAS
Digitally signed by KEVIN A PARED CUEVAS
Date: 2026.01.29 09:05:13 -04'00'

Kevin Pared
Special Agent
Homeland Security Investigations

Sworn pursuant to FRCP 4.1 on this 29th day of January 2026, at 11:07 AM by telephone.

HON. MARCOS E. LÓPEZ
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF PUERTO RICO